IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10-10089-01, 02-WEB |
| v. | ) | |
| | ) | |
| JAMES BOBBY BUTLER, JR., and | ) | |
| MARLIN JACKSON BUTLER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Memorandum and Order**

This matter came before the court on January 10, 2011 for a hearing on pending motions.
The court ruled orally on some of the motions and took the remainder under advisement. This
written memorandum will summarize the court's oral rulings and will address the remaining
motions.

1. **Motions to Join**. (Docs. 35, 45).

Defendant James Butler's Motion to Join in the pretrial motions of Marlin Butler (Doc.
35) and Marlin Butler's Motion to Join in the pretrial motions of James Butler (Doc. 45) are
unopposed and are GRANTED.

2. **Motion to Strike Surplusage**. (Doc. 30).

Defendants move to strike what they consider surplusage from the Indictment. Rule 7(d)
of the Federal Rules of Criminal Procedure provides the court authority to strike surplusage. But
"[a] motion to strike language from an indictment should only be granted where the language is
'clearly irrelevant to the charges and inflammatory or prejudicial to the defendant.'" *United
States v. Harding*, 2009 WL 982106 (D. Kan., Apr. 13, 2009) (*quoting United States v. Jackson*,

850 F.Supp. 1481, 1506 (D. Kan. 1994)).  This is a high standard because the truthfulness of any particular factual allegation in an indictment should be decided by a jury rather than the court. *Harding*, at *3.  After reviewing the Indictment, the court concludes the motion to strike should be denied.  The challenged allegations are fairly lengthy, but they appear to be relevant to the commission of the alleged offense and they serve to identify and clarify the basis of the charges.

      3.  <u>**Motion to Exclude Indictment from the Jury Room**</u>.  (Doc. 31).

      Defendants argue the Indictment should not be provided to the jury because it "reads ... like a press release" and is basically a narrative of the Government's argument.  The court's usual practice in cases involving lengthy indictments is to include a summary of the charges in the final instructions, with a copy of the full document attached.  The court will likely follow that practice here.  Given the significant number of different episodes alleged, the indictment may be helpful to the jury in its consideration of the evidence.  The motion to exclude is therefore denied.

      4.  <u>**Motion for Pretrial James Hearing**</u>.  (Doc. 33).

      Defendants move for a pretrial *James* hearing to determine the admissibility of co-conspirator hearsay statements.  In response, the Government has filed a brief with a detailed proffer of evidence it intends to introduce at trial, as well as a "*James* log" describing some 70 separate statements that may fall under the co-conspirator hearsay exception.[1]  The log contains a significant description for each statement, including identification of the witness, the declarant, the substance of the statement, the approximate date of the statement, and the source document

_____

    [1] The Government states that it will file a supplemental list of co-conspirator statements if any additional ones are discovered prior to trial.  Doc. 52 at 2.

in the Government's record of investigation.

Under Fed.R.Evid. 801(d)(2)(E), evidence of statements by co-conspirators that would otherwise be hearsay may be admissible if the district court determines (1) by a preponderance of the evidence that a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy. *United States v. Cornello-Legarda*, 381 Fed.Appx. 835, 845, 2010 WL 2255044 (10th Cir. 2010) (*quoting United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir.1994)). "Before making a final ruling on the admissibility of such statements, a district court may proceed in one of two ways: (1) hold a James hearing outside the presence of the jury or (2) provisionally admit the evidence but require the Government to connect the statements to the conspiracy during trial." *Cornello-Legarda* at 845 (*citing Urena*, 27 F.3d at 1490-91). Although a James hearing is the preferred approach, the district court retains discretion to follow the latter course. *Urena* at 1491.

Although use of a written proffer is not favored as a substitute for testimonial evidence, in some circumstances it is permitted. *See United States v. Owens*, 70 F.3d 1118, 1125 (10th Cir. 1995)*; United States v. Roberts*, 14 F.3d 502, 514 (10th Cir. 1993). "At times, the court will be able to make its determination on the basis of proffers or even on the opening or what it knows of the available proof from the pretrial or suppression hearings." *United States v. Hernandez*, 829 F.2d 988, 994 (10th Cir. 1987). In this instance, the Government has provided a complete written summary, and requiring the Government to produce an agent to recapitulate the same material would be a significant waste of resources. In making preliminary determinations concerning the admissibility of evidence, the court is not bound by the rules of evidence, and it

may consider a proffer of the type submitted by the Government. *See* Fed.R.Evid. 104(a).

The Government has set forth at pages 16 through 29 of its brief a proffer of testimony describing a large number of incidents involving each of the defendants knowingly assisting hunters in unlawfully taking deer through guided hunts. A variety of unlawful means are set forth, including taking more deer than permitted in a season, taking deer on a unit not authorized by a permit, using firearms to take deer during archery season, and unlawfully taking deer with the use of spotlights. The Government proffers that several witnesses will testify to facts establishing not only knowledge by James and Marlin Butler of the unlawful taking of deer, but the facilitating or directing of such takings by one or both defendants through guided hunts, with hunters traveling in interstate commerce, as well as the facilitating or directing of interstate transportation of wildlife by the defendants. The Government proffers that "JR," an unindicted co-conspirator, performed taxidermy services even when he knew the deer were taken illegally, in return for which the defendants referred CLS hunters to him and let him pay for his own hunts with taxidermy services. Another unindicted co-conspirator, "RR," worked as an assistant at CLS and eventually provided guided hunts. The Government identifies other individuals who allegedly supported the conspiracy by purchasing guided hunts from the defendants and by transporting antlers and other deer parts out of Kansas, knowing the deer were taken illegally. The Government represents that JR and RR, as well as hunters who received services from the defendants, will testify at trial. Their testimony will be corroborated, according to the Government, by physical evidence seized in searches of CLS and James Butler's residences in Texas, as well as by admissions made by the defendants. The Government outlines the expected testimony of each of these witnesses in its brief. Based upon the materials submitted, and

assuming the Government's evidence at trial comports with its proffer, the court preliminarily

finds the Government's proffer shows by a preponderance of evidence that the alleged

conspiracy existed during the period claimed and that the defendants were both members of it, as

was the individual identified as JR. The court further preliminarily finds that the statements

identified in the Government's James log were made in the course of and in furtherance of the

conspiracy. The overwhelming majority of these statements were allegedly made by the

defendants to hunters who were guided at CLS and served to further the conspiracy's objective

of selling wildlife that were unlawfully taken and transported in interstate commerce.

The defendants may renew their motion at the time of trial and, upon such a motion, the

court will reconsider the admissibility of these statements in light of the actual evidence

presented at trial. *See United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979). As of now,

however, the defendants' motion for a more extensive *James* hearing or to exclude any evidence

of the alleged co-conspirator hearsay statements is denied.

5. **Motion to Determine Method of Valuation of Deer**

Both sides ask the court to determine the method of valuation of the deer taken in this

case. The "market value" of any wildlife sold must generally exceed $350 in order to constitute

a crime under the Lacey Act, and the total market value of the wildlife involved in the offense is

a significant factor in the advisory guideline range under USSG 2Q2.1.

The defense points out that the Lacey Act is built upon state law, and defendants say that

Kansas law establishes a value of $1000 for each deer unlawfully taken (and $400 per deer

before 2007). The defendants argue the value of the 22 approximately deer mentioned in the

Indictment should be based on the value set by Kansas law, which they say Judge Crow did in a

1998 case, *United States v. Britt*, No. 98-40035 (D. Kan.).  The Government, meanwhile, relies

on *United States v. Atkinson*, 966 F.2d 1270 (9th Cir. 1992), which found that in a case of

unlawfully guiding hunters, an animal's market value "is best represented by the amount a hunter

is willing to pay for the opportunity to participate in the hunt."  The Government notes the Tenth

Circuit has cited *Atkinson* with approval for the premise that guiding services constitute a sale of

wildlife under the Lacey Act.[2]  The Government also argues the *Britt* case cited by defendants is

unpersuasive, in part because the figure set by Kansas statute does not constitute a "market

value." It also says that under Kansas law, the value for trophy deer of the size at issue in this

case are subject to higher penalties of $5,400 prior to 2007, and $6,000 per deer thereafter.

The court concludes, applying the long-standing definition of market value, that the

market value of wildlife means the amount a willing buyer and a willing seller would agree upon

for a sale of the wildlife.  In considering evidence of the market value, the court will follow the

reasoning of *United States v. Atkinson* that the amount a hunter is willing to pay for the

opportunity to hunt the animal may be considered as evidence of the "market value of the

wildlife."[3]  This view is consistent with the Lacey Act, which defines a sale to include guiding a

hunter in an unlawful taking of wildlife.  The court notes that the Government has also cited

some evidence of the retail price of antlers for various size deer, which would also constitute

---

[2] This premise is contained in 16 U.S.C. § 3372(c)(1), which provides that offering or providing guiding services for the illegal taking of wildlife is deemed a sale of wildlife under the Act.

[3] To the extent that a guiding or hunting fee may include particular goods or services that are essentially separate from the guiding or hunting – such as accommodations or meals – the court will look only to the value of the guiding service or the hunting opportunity itself as evidence of the market value of the wildlife.

evidence of market value.

The guidelines provide that when the fair market retail price of the wildlife is difficult to ascertain, the court may use any reasonable estimate, including "the acquisition and preservation (e.g., taxidermy) cost."  This reference to "acquisition cost" provides further support for using the cost of guiding services to establish market value.  It also suggests that the price for taxidermy services may be considered.  The court will consider any evidence presented of these values.

As for defendants' argument for using the flat $1,000 value set by Kansas law, the court concludes that such a figure – which is said to be the "minimum" value for a deer – does not constitute a "market" value.  Moreover,  as the Government points out, Kansas law appears to provide for significantly higher penalties (e.g., a fine of $5,000) where larger "trophy" animals are involved, see K.S.A.§ 32-1032, and the Government says many of the deer at issue in this case would qualify for such treatment.

6.  **Motions to Sever**.

Both defendants move for a severance, arguing they would prejudiced by a joint trial. The motions are based on statements given by each defendant after his arrest.  Defendants argue the use of their co-defendant's statement against them would violate their Sixth Amendment right to confront witnesses, contrary to *United States v. Bruton*, 391 U.S. 123 (1968). Defendants assert that any attempt to redact the statements to avoid prejudice would be "difficult, if not impossible" in this instance.

Rule 8(b) permits an indictment to jointly charge defendants if they participated in the same act or transaction constituting an offense.  This rule reflects a preference for joint trials of

defendants who are jointly charged. *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Courts have specifically recognized a presumption for joint trials in cases involving allegations of conspiracy. *See United States v. Stiger*, 413 F.3d 1185, 1197 (10th Cir. 2005). Rule 14(a) nevertheless allows a district court to sever the trial of a defendant if a joint trial would be prejudicial. A district court should grant such a severance, however, only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. *Zafiro*, 506 U.S. at 537.

Defendants have not explained why redaction of their statements, together with a limiting instruction to the jury, would not be sufficient to avoid any *Bruton* problems. *See Richardson v. Marsh*, 481 U.S. 200 (1987). The Government says that for each defendant it can redact their statement to remove any reference to the co-defendant by name, relationship or other descriptor.[4] Doc. 48 at 9-10. *Cf. Gray v. Maryland*, 523 U.S. 185 (1998) (replacing name with an obvious blank or otherwise indicating that name had been deleted was not sufficient to avoid incrimination). The court sees no reason why such redaction would not be sufficient to avoid an improper incriminating statement. *Cf. United States v. Nash*, 482 F.3d 1209, 1218 (10th Cir.), cert. denied, 128 S.Ct. 822 (2007) (*Bruton* rule does not apply to statements that are not directly inculpatory but only inferentially incriminating). The defendants' motion to sever will therefore be denied.

7. **Motion to Exclude Speculative Opinion Testimony**.

Defendants anticipate the government will have law enforcement agents testify that they compared photographs of dead deer, allegedly killed in Kansas, with deer mounts seized in

---

[4] This issue may be partially moot in view of the court's rulings *infra*.

Texas and Louisiana, and these agents may offer opinions that the deer mounts match the deer in the photos. Defendants argue this goes beyond the permissible bounds of lay witness testimony and amounts to speculation. Defendants say they are unaware of any special training by these witnesses that would allow them to express such opinions about animal anatomy, and they ask for an order excluding the "speculative testimony" of any such witnesses.

The Government argues that having officers make a simple visual comparison between photographs of the deer and the actual deer mounts is proper lay testimony based on the rational perceptions of the witnesses. The Government says the agents were able, without any special or technical analysis, to match photos of some deer with the actual mounts based upon a close inspection of these items. They also allegedly confirmed their findings through interviews of the hunters who actually shot the deer. The Government argues the officers' conclusions are not based upon scientific analysis but upon rational conclusions from having closely examined the antlers and the photos.

Rule 701 allows a lay witness to testify in the form of an opinion if the testimony is based on the rational perception of the witness, and if the testimony would be helpful to the jury and is not based upon on scientific or other specialized knowledge within the scope of the expert rule.

The motion to exclude this testimony will be denied at this time, subject to reconsideration based on the actual evidence presented at trial. Witnesses who have made a physical examination and comparison of deer antlers and photos may offer rational opinions about similarities between the two. Assuming the witnesses do not go "too far afield," the court will allow them to testify about the specifics of their examination and to offer opinions rationally based on that examination. The defendants may of course cross-examine the witnesses about the

basis for their opinions.

8. **<u>Motion to Suppress Evidence Seized Pursuant to Search Warrants</u>** (Docs. 37, 39, 57).

Defendants move to suppress evidence obtained as a result of three searches conducted pursuant to judicially authorized warrants. The first search was of Camp Lone Star in Comanche County, Kansas, on April 8, 2009. The other two searches – one on a residence in Center, Texas, and one on a residence in Martinsville, Texas – occurred on April 10, 2009. Defendants offer a list of reasons why they believe the searches were unlawful, including that the affidavits used to obtain the warrants failed to set forth probable cause for a Lacey Act offense; the resulting warrants were over-broad and failed to specify the things to be seized; the officers executing the warrants exceeded the scope of the warrants and engaged in general searches; the "plain view" doctrine was inapplicable because the officers were not lawfully present at the time of the searches; and the "good faith" exception of *United States v. Leon* does not apply because the affidavits were so deficient as to preclude any reasonable belief in their validity by a well trained officer and because the magistrate abandoned his judicial role in issuing the warrants. In a supplemental brief filed after the hearing, defendants expand on their assertion that the affidavit was deficient. They argue the affidavit relied in large part on information from a confidential informant, but defendants contend it omitted material information by failing to disclose that the CI stood accused of multiple federal wildlife violations and was cooperating with the government to avoid criminal prosecution. Defendants move to suppress all evidence obtained as a result of these searches.

In determining whether there was probable cause to issue a search warrant, this court gives "great deference" to the decision of the issuing magistrate. *United States v. Sims*, 428 F.3d 945 (10th Cir. 2005). The court reviews only to determine whether the magistrate had a "substantial basis" for finding probable cause. Such a deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant. *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984). This court must keep in mind that the magistrate's task was merely to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Sims*, supra.

A review of the first affidavit of U.S. Fish and Wildlife Special Agent John T. Brooks (Dated April 2, 2009) shows that a significant amount of information therein was provided by confidential informant "CPI-1." The affidavit said an individual named Mike Segal contacted agents with information about the defendants' illegal hunting activities and told them a friend of his – CPI-1 – was a client of James Butler. Segal provided information about illegal hunting and gave the names of several individuals who hunted with Butler. The affidavit shows that agents later confirmed some of Segal's information through personal observation and investigation. The affidavit states that Agent Brooks contacted CPI-1 and obtained information from him concerning the defendants' activities. Two agents subsequently interviewed CPI-1 about his knowledge of illegal activities at Camp Lone Star. He provided detailed information about those activities, some of which he allegedly observed first-hand. The affidavit describes subsequent contacts between CPI-1 and agents and provides extensive details of CPI-1's description of illegal hunting by individuals at CLS, including the defendants. Much of the information

provided by CPI-1 about the ongoing nature of illegal hunting activities at CLS was in fact corroborated by agents through extensive surveillance and investigation. For example, agents discovered through first hand observation information suggesting that hunters at CLS, including the defendants, were unlawfully hunting deer with spotlights and taking deer with hunting tags issued in units other than the one authorized. They confirmed the existence of a pond at CLS where numerous deer remains were discovered, as they had been told by CPI-1. Agents also confirmed transfer-of-ownership information that was provided to them by CPI-1. In sum, the affidavit shows that agents corroborated a significant amount of information provided by CPI-1. When considered as a whole, the affidavit makes a sufficient showing of the reliability of the information provided by the confidential informant. *See Illinois v. Gates*, 462 U.S. 213, 235 (1983) (The Fourth Amendment does not impose technical requirements of elaborate specificity upon nonlawyer affiants seeking to procure a search warrant). *Cf. United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir.2000) ("When there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant."). Additionally, the court concludes that the totality of the circumstances disclosed in the affidavit are adequate to provide a substantial basis for the magistrate's conclusion that probable cause existed to believe the defendants were engaged in violations of the Lacey Act, specifically relating to the illegal taking and transportation of deer, and that evidence of such violations would likely be found at the CLS property listed in the warrant.

As for defendants' allegation that the affidavit misled the magistrate by failing to disclose CPI-1's involvement in criminal activity, the affidavit states plainly that the affiant "questioned CPI-1 about his illegal hunting activity with J. BUTLER," and notes that CPI-1 recounted how

he killed three buck deer during the 2005 season and took them to a taxidermist (JR) used by the Butlers. Doc. 56-1 at ¶ 19. And the informant's cooperation with law enforcement is discussed and is apparent throughout the affidavit. Thus, both CPI-1's involvement in illegal activities and his cooperation with law enforcement were clearly disclosed in the affidavit. The two Texas affidavits contain similar disclosures. Under the circumstances, this claimed omission was not material and would not have affected the magistrate's finding of probable cause. Because the defendants have failed to show a material omission, the motion to suppress the searches on this basis must be denied. *See United States v. Kennedy*, 131 F.3d 1371, 1377 (10th Cir. 1997) ("If the magistrate judge would not have altered his probable cause determination even if he had been presented with the omitted material, then the warrant should be upheld.").

In addition to the above-described CLS affidavit, Agent Brooks executed two other affidavits, both dated April 10, 2009. The latter two were used to obtain search warrants for residences owned by James Butler in Center and Martinsville, Texas. These two affidavits include allegations that officers obtained confessions from several hunters who had hunted at CLS with James Butler from 2004-2008, and who said they had participated in the taking of deer by illegal means and had returned with those items to Texas. They also included specific allegations reasonably suggesting that evidence relating to the alleged offense would be found in the two residences named in the warrants. As with the first affidavit, the court concludes that the latter two were sufficient to provide a substantial basis for the magistrate's finding of probable cause.

Defendants contend that the warrants were overbroad or, alternatively, that the officers executing the warrants exceeded the scope of any legitimate search by seizing numerous deer

antlers that had not been unlawfully taken. Defendants point to Agent Brooks' testimony at the hearing, where he conceded that of the total 23 deer heads or mounts seized by officers during these three searches, the Government has only been able to tie two of the seized items to an actual unlawful taking of wildlife. His testimony also indicated that it would have been impossible at the time of the search for officers to fully determine which deer had been taken unlawfully and which had been taken lawfully. Defendants argue the officers engaged in an improper general exploratory search, that they flagrantly exceeded the scope of the warrant, and that total suppression of all of the items found in the searches should be imposed as a result of the officers' conduct.

Among other things, the affidavits in this case sought authority to seize "any and all illegally possessed wildlife or any part thereof ... related to violations of federal wildlife laws including but not limited to the Lacey Act, 16 U.S.C. § 3371 et. seq" that were found at the specified locations.[5] The Fourth Amendment requires that a warrant describe with particularity the things to be seized. *United States v. Grubbs*, 547 U.S. 90, 97 (2006). Although it is true that for the most part, the agents were unable to determine merely by looking at deer mounts or remains whether that particular deer had been taken unlawfully, and that as a result agents seized most of the deer mounts they found in the search locations,[6] the court concludes that the warrant

---

[5] The search warrants incorporated by reference the agent's description of the items to be seized. The Kansas search warrant – which is not included in the Government's attachments to Doc. 56-2, but which is otherwise contained in the court's records – indicated that an "Attachment B" describing the things to be seized was attached to the warrant. The Texas warrants indicate that at least the specific paragraphs of the agent's application listing the items to be seized (paragraphs 35-38) were incorporated by reference and attached to the warrant.

[6] U.S. Fish & Wildlife Agent George Morrison, who participated in the search of the Martinsville, Texas, residence, testified that agents left some deer heads at that residence

was not fatally overbroad for that reason. "The fourth amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." *Cassady v. Goering*, 567 F.3d 628, 635 (10th Cir. 2009) (*quoting United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988)). The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause. *Cassady*, 567 F.3d at 635 (*quoting Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985)). This was not a general exploratory rummaging through the defendants' belongings in the hopes of turning up some unknown indication of illegality. The Government cited facts in its affidavits showing a fair probability that deer remains of unlawfully taken deer would be found in the search locations. But given the difficult nature of distinguishing one deer (or one set of antlers) from another, the ability to ultimately determine whether particular deer remains had been taken unlawfully by necessity required seizure of all of the deer remains for further examination and comparison. In short, the circumstances here did not allow the Government to be any more particular as to which wildlife remains should be seized. "Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988) [citation omitted]. "When the circumstances of the crime make an exact description of the fruits and

---

because the agents thought they were clearly Texas (as opposed to Kansas) deer or they were just antlers laying on the floor, and the agents did not feel they had probable cause to seize those items.

instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking." *See United States v. Harris*, 903 F.2d 770, 775 (10th Cir. 1990). The court concludes that the warrants here were not overbroad and the officers did not unlawfully exceed the scope of the warrant. Nor does the court find any other basis for concluding that the challenged searches violated either of the defendant's rights under the Fourth Amendment or any other constitutional provision.

**9. Motion to Suppress Statements of James Butler** (Docs. 41). Defendant James Butler seeks to suppress evidence of statements he made to agents on April 8, 2009. He argues the statements were obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) or were otherwise obtained in violation of his rights under the Fifth Amendment.

The evidence presented at the hearing shows the following. On April 8, 2009, U.S. Fish & Wildlife Special Agent George Morrison participated in an interview of defendant James Butler at Butler's residence near Center, Texas. Morrison was in a vehicle with Sgt. Chappell of the Texas Department of Wildlife and Parks when the agents passed by James Butler's vehicle going the other way. The agents turned around and followed Butler to his residence. The agents got out of their vehicle and introduced themselves to Butler, who had gotten out of his own truck. Morrison showed off his identification and shook hands with Butler. Morrison said they would like to talk to him and asked if he had a place where they could sit down. James replied that he was willing to talk, but that at some point he might want to talk to an attorney and, if he did, he would end the interview. James showed the agents into his house and they sat down in a room near the kitchen. Morrison said they wanted to talk to him about the hunting activities at Camp Lone Star. Morrison told Butler at the outset that he was not under arrest and was not

going to be put under arrest at the end of the interview.  He told Butler he did not have to answer any of the questions they were going to ask.

Butler agreed to talk and discussed various things with the agents, including ownership of the camp, whether there was any illegal hunting going on there, the role of James' brother Marlin at the camp, and whether James was paid to provide guiding services for hunters.  After about an hour, at 12:22 p.m., James said he thought he might want to speak to an attorney.  Morrison said this was his opportunity to talk, but Butler said he wanted to talk to an attorney.  Morrison ended the interview at that point and the agents left the residence.

Morrison testified that James Butler was never under arrest and, for that reason, no Miranda warnings were given to him.  He said Butler never asked to take a break or to end the questioning.   Morrison was dressed in plain clothes, with a short sleeve shirt and a firearm holstered on his side, along with a belt badge.  Chappell was similarly outfitted, with a firearm and a white collared shirt with a Texas Department of Wildlife insignia.  The agents never unholstered their firearms and their conversation with James was polite throughout.  James Butler appeared to Morrison to be about 40 years old and did not seem to have any difficulty understanding the questions.  Morrison was aware at the time of the interview that a warrant to search Camp Lone Star was in the works and would soon be executed.

"It is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question." *United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009).  The police are only required to give *Miranda* warnings for interrogation "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492 (1977).  Whether a person is "in custody" for purposes of *Miranda*

depends on the type of police encounter involved. *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). *Miranda* warnings are only required where there is a formal arrest or a restraint on a person's freedom of movement of the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983). *See also Miranda v. Arizona*, 384 U.S. at 444 (rule applies "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way").

The determination of custody is objective rather than subjective. The court must determine whether *a reasonable person* in the suspect's position would have understood the situation as the functional equivalent of formal arrest. *See Jones*, 523 F.3d at 1240 (citations omitted). The determination must be made from the totality of the circumstances. Relevant factors include the extent to which the suspect is made aware that he is free to refrain from answering the questions or to end the interview; whether there was prolonged accusatory questioning; and whether the circumstances show a police-dominated atmosphere. A police-dominated atmosphere may depend on circumstances such as separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone to imply that compliance with the request might be compelled. *See United States v. Griffin*, 7 F.3d 1512, 1518-19 (10th Cir. 1993).

Under the totality of the circumstances, the court concludes that James Butler was not in custody for *Miranda* purposes during his questioning by officers on April 8, 2009. The uncontroverted evidence shows that the two officers introduced themselves to Butler outside of his residence. Aware of their purpose, Butler voluntarily agreed to talk to them and allowed the

officers into his residence.  The officers specifically informed him he was not under arrest, that

he was not going to be arrested at the conclusion of the interview, and that he did not have to

answer any questions.  *Cf. United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir.1993) ("[T]he

lack of a police advisement that the suspect is at liberty to decline to answer questions or free to

leave is a significant indication of a custodial detention.").  The evidence shows that James was

specifically aware of his right to end the interview and to consult with an attorney if he wanted.

James Butler appeared to be a person of mature age and at least average intelligence.   Butler

proceeded to answer the officers' questions for an hour or so, until he made clear his desire to

talk to an attorney, at which point the agents terminated the interview and left.  *Cf. United States

v. Zamora*, 222 F.3d 756, 766 (10th Cir. 2000) (statement by defendant that "I might want to talk

to an attorney" was ambiguous and did not require agents to terminate interview).  Nothing said

or done by the officers would indicate to a reasonable person that he was under arrest or that his

freedom of action was retrained in any significant way.   In these circumstances, the defendant

James Butler was not subjected to custodial interrogation, and the Government's use of any

statements he made does not violate the rule of *Miranda v. Arizona*.  Moreover, because the

evidence shows that the defendant gave a statement to the officers of his own free will, and not

because his will was overborne by any improper coercion, the court likewise rejects his claim

that the statements were not voluntary or that they were otherwise obtained in violation of his

rights under the Fifth Amendment.  *See United States v. Chalan*, 812 F.2d 1302 (10th Cir. 1987).

The evidence further refutes any claim that the agents violated his right to counsel or deprived

him of the right to speak to an attorney.  Accordingly, defendant James Butler's Motion to

Suppress Evidence of Statements is denied.

10. **Marlin Butler's Motion to Suppress Statements** (Doc. 43).

Marlin Butler likewise contends he was in custody during an interview on April 7, 2009, and that agents violated his rights by failing to give *Miranda* warnings. He further contends that his statements were not voluntary.

The evidence relating to questioning of Marlin Butler showed the following. On April 7, 2009, at about 6:30 p.m., U.S. Fish & Wildlife Special Agent Kevin Ellis went with two other officers to Marlin Butler's residence in Martinsville, Texas. The other officers were Phil Kirkland, a game warden with the Kansas Department of Parks and Wildlife, and Jarrod Bryant, a game warden with the Texas Parks and Wildlife Department. The officers arrived at the residence and knocked on the door, but no one answered. They knocked loudly several times, as they could see Marlin's vehicle was at the residence, but they received no response. Just as they were getting ready to leave, they noticed someone inside, and defendant Marlin Butler opened the door. He was wearing gym shorts and a t-shirt. He had been asleep after having worked a night shift in the oil fields. Agents Ellis and Kirkland were in plain clothes, while Bryant was in his duty uniform. All three officers carried firearms. Ellis introduced the agents, showed Butler his credentials, and said they were investigating activities at Camp Lone Star and would like to talk to Butler about his involvement. Marlin stepped inside to allow the officers into the residence.

There was some conflicting evidence about Marlin's use of the bathroom while the agents were in his house. Ellis testified that Butler told them at the outset of the interview that he just woke up and needed to use the bathroom. Ellis said he told Butler they would need to "clear" the bathroom first to make sure there were no weapons, which the agents did, and then

"we allowed him to go in and use the rest room."  Marlin Butler testified that he was allowed to

use the bathroom about two hours into the interview, not at the outset, and that "an officer with a

gun [was] standing right behind me when I peed, approximately 3 feet behind me" with the door

of the small bathroom left open.  Butler also testified that he asked "three or four" times during

the interview to use the bathroom.  To the extent he suggested that he was refused permission at

some point to use the bathroom, his testimony was conflicting and vague.  There is no credible

evidence that the agents ever denied a request by Butler to use the bathroom.[7]  On the other

hand, the Government never contradicted Butler's testimony that an agent stood behind him with

the door open while he used the bathroom, and the court finds that testimony to be credible.

The interview began after Butler showed the officers into the living room of the

residence.  The place was sparsely furnished – Butler explained that his wife had recently moved

out – and one of the officers retrieved a lawn chair from outside so they all could sit down.  The

evidence indicates that Marlin talked to the agents for an extended period – nearly three and a

half hours, until shortly before 10:00 p.m. – and that he answered all of their questions, including

questions about his and his brother's involvement at Camp Lone Star.  The topics covered

included hunting activities at the camp over a period of several years, the particular roles played

---

[7] Marlin Butler testified:

Q.  Okay. Were there other times during the course of that interview, however, when you asked
to use the rest room and were told that you could not?
A.  Yes, sir.  I asked several times to go to the rest room.
Q.  How many's several?
A.  Three or four.
Q.  Okay.  Over the three-and-a-half to four-hour time period that the interview took place?
A.  Yes, sir.
Q.  And other than that initial time, you weren't allowed to do so?
A.  I was allowed to, but not at the first, about two hours after the interview.
Tr. p. 89.

by Marlin and James, who else knew about the activity, and how leases were secured to allow hunting in the area.  There is no evidence that Butler ever asked to take a break or to stop the interview.   There is no evidence that the agents ever raised their voices or browbeat or threatened Butler.  On the other hand, there is no evidence that agents ever told Marlin that he was not under arrest,[8] that he did not have to talk, that he could end the interview any time he wanted, or that he had the right to have an attorney present.   The agents apparently did not ask Butler if he needed a break or if he needed something to drink.

Butler testified that he had previously been arrested "two or three times," and that he had been interviewed by law enforcement before "maybe once."  He had previously been read his *Miranda* rights on at least one of those occasions.  Butler testified he did not know that he had the right to an attorney in this instance and that he was scared because he "thought a game warden can come into your home no matter what."[9]  The only mention of Butler having an attorney came during the interview when Marlin explained that he had sold some of the deer heads because he needed money to pay his attorney on an unrelated case.

The phone rang in Marlin's residence a number of times during the interview.  According to Marlin, he asked if he could answer but several times the agents "told me I could not."  When

---

[8] The Government's response to the motion alleged that agents informed Marlin that he was not under arrest and that he would not be arrested at the end of the interview.  Doc. 51 at 2. No such evidence was presented, however.  The agent only testified that Marlin *was never told that he was in custody* during the interview.  Doc. 62 at 70.

[9] Because the question of custody is an objective inquiry, factors such as the suspect's age, prior experience with law enforcement, and his subjective beliefs are generally irrelevant in determining whether a reasonable person in the same circumstances would have regarded himself as being constrained to a degree associated with formal arrest.  *See Yarborough v. Alvarado*, 541 U.S. 652, 668 (2004).

asked if Marlin was not allowed to answer the phone, Agent Ellis testified, "[w]e asked him not to answer the phone while we were doing the interview, yes."

At around 9:30 p.m., James Butler pulled up in his truck at Marlin's residence. The agents discussed that it might be James, and Ellis stepped outside and met James at the door of the residence. Ellis showed his credentials and told James that he needed to leave. Ellis testified that he knew both James and Marlin had some criminal background and he did not want them interacting at that point. James got back in his truck and left. There were no charges against either of the defendants at that time, although the agents believed James was involved in illegal activities at Camp Lone Star and Marlin had just given a statement implicating both he and James. When Ellis came back in the house there was some discussion about James and, according to Ellis, Marlin "was visibly nervous about the fact that James now knew that he had been talking to us concerning the investigation. He seemed concerned for his safety, said that he wasn't going to stay at his home that night and was going to stay somewhere else, and from that I believed it was probably because he feared that James would come back later." Ellis said Marlin told them James had been in prison before and that they had had some disputes in the past.

The agents obtained a number of deer mounts and antlers at the residence that, based on Marlin's statement, they believed had been taken unlawfully. When asked whether Marlin voluntarily game the items to him, Agent Ellis responded, "Yes. We told him we were going to seize them, and he voluntarily abandoned them." After the agents finished filling out property receipts for these items, they left the residence. Marlin left at the same time, indicating he was going somewhere else for the night.

A review of the circumstances indicates that a reasonable person in Marlin Butler's position would have regarded himself in custody at the time of the interview. First of all, the agents apparently never informed Marlin that he was not under arrest or that he could end the interview if he wanted. *See United States v. Griffin*, 7 F.3d 1512, 1518-19 (10th Cir. 1993) ("[T]he lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention."). The appearance of three armed officers at the residence would, absent any representation to the contrary, tend indicate to a reasonable person that the agents may be taking the person into custody.

The interview was extended in duration, lasting about three and half hours. It apparently covered a number of topics over a span of several years, although the Government still did not explain why the interview took so long to complete. The evidence indicates the officers never informed the defendant during the interview that he could take a break if he wanted, nor did they offer him an opportunity to obtain any food or drink during the interview. An interview under these circumstances – extending over a period of hours, conducted by three agents, without any suggestion of a break or an indication of when it would end – would tend to convey to a reasonable person that he was under the control of the officers and was not free to end the encounter.

The evidence shows a significant restriction by the officers on defendant's freedom of movement while they were in the house. The officers would not allow him to use the bathroom until they cleared it for weapons, and they kept him under observation while he used the restroom. This fact weighs clearly in favor of a finding of custody. The officers' actions may have been entirely reasonable under the circumstances – given that the offense under

24

investigation involved the use of firearms by experienced hunters – but it nonetheless would convey to a reasonable person a message that he is under the custody and control of the officers, regardless of the fact that he is in his own home. *See United States v. Revels*, 510 F.3d 1269, 1276 (10th Cir. 2007); *United States v. Griffin*, 922 F.2d 1343, 1354-55 (8th Cir. 1990) ("Questioning which occurs in the suspect's own home may provide a margin of comfort, but ... the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting."). There could hardly be a more extensive example of exercising control over a person in their own home than keeping them under observation while they use the bathroom.

A second indication of police control over Marlin's freedom of action occurred when James showed up at the house and the agents sent him away. Of course, it would normally be up to the resident of the home to determine who could enter the house. Asserting a right to keep others out, without seeking permission or approval to do so from Marlin, would indicate to a reasonable person in Marlin's position that the officers were in control of the premises and that they, not he, had the right to determine who could have access to the house or to Marlin himself. Keeping a suspect isolated from family members is typically an indication of custody, although the court recognizes there are extenuating circumstances here. This particular family member was a suspect in the criminal activity being investigated and had just been implicated by Marlin's statement. Marlin made no request to communicate with him, and the evidence suggests Marlin may not have wanted to communicate with James at all at that particular moment. Still, the evidence shows that Marlin was given no choice in the matter, and the officers' actions would

convey to a person in his position that they were restricting his freedom to interact with other people.

A third indication of police control over defendant's freedom of action involved phone calls into the house. There was a slight discrepancy in the evidence as to what the officers said to Butler about the calls, with Marlin testifying that he asked to answer the phone and the officers "told me I could not," while Agent Ellis testified that they "asked him not to answer the phone while we were doing the interview." While the precise language used was not shown by the evidence, it appears more likely than not that the officer conveyed by tone or by language that the defendant was not allowed to answer the phone. Again, the officers may have had legitimate reasons for doing so, but the point is that their conduct would convey to a reasonable person that he was in their custody and control and that he was not allowed to communicate with others. *Cf. Miranda v. Arizona*, 384 U.S. 436, 467 (1966) (warning is required during "incommunicado interrogation of individuals in a police-dominated atmosphere.").

The evidence here is not one-sided. The agents did not demand entry into the house, they did not give any verbal indication that they were going to arrest Marlin, they never touched him physically, they did not handcuff him, and he was allowed to go on his way at the conclusion of the interview. Nor is there any evidence that the officers raised their voices, made demands for admissions of guilt, or threaten his liberty if he did not tell them what they wanted. *Cf. Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."). Nor is there any evidence that Marlin ever expressed any desire to end the interview or

to leave. Yet the agents controlled the defendant's freedom of movement in his house, they controlled access of others to the house and to the defendant, and they restricted the defendant's freedom and ability to communicate with others. *Cf. Orozco v. Texas*, 394 U.S. 324 (1969) (*Miranda* warnings required where defendant who was in custody was interrogated in his home). Under the totality of the circumstances, the evidence shows that Marlin Butler was deprived of his freedom of action in a significant way, in what was essentially a police-dominated atmosphere, and that a reasonable person in his position would have understood his situation as the functional equivalent of arrest. The failure to give *Miranda* warnings in these circumstances requires the court to grant Marlin Butler's motion to suppress evidence of any statements he made in response to interrogation on April 7, 2009. *See Dickerson v. United States*, 530 U.S. 428 (2000).

### *Conclusion*.

Defendants' Motions for Joinder (Docs. 35, 45) are GRANTED;
Defendants' Motion to Strike Surplusage (Doc. 30) is DENIED;
Defendants' Motion to Exclude Indictment (Doc. 31) is DENIED;
Defendants' Motion to Exclude Speculative Opinion Evidence (Doc. 32) is DENIED;
Defendants' Motion for Pretrial James Hearing (Doc. 33) is DENIED except to the extent stated above;
Defendants' Motion to Determine Method of Valuation of Deer (Doc. 42) is GRANTED;
Defendant James Butler's Motion to Sever (Doc. 36) and Defendant Marlin Butler's Motion to Sever (Doc. 44) are DENIED;
Defendants' Motions to Suppress Evidence Seized Pursuant to Search Warrants (Docs. 37, 39, 57) are DENIED;
Defendant James Butler's Motion to Suppress Statements (Doc. 41) is DENIED; and
Defendant Marlin Butler's Motion to Suppress Statements (Doc. 43) is GRANTED.

IT IS SO ORDERED this __31st__ Day of January, 2011, at Wichita, Ks.


s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge